In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2503

Platinum Technology, Inc.,

Plaintiff-Appellee,

v.

Federal Insurance Co.,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99-C-7378--James F. Holderman, Judge.

Argued January 23, 2002--Decided March 7, 2002

  Before Bauer, Coffey and Evans, Circuit
Judges.

  Bauer, Circuit Judge.  Federal Insurance
Company appeals from a judgment in favor
of Platinum Technology Incorporated on an
Illinois law claim for breach of an
insurer's duty to defend. For the reasons
that follow, we reverse the judgment and
remand the matter to the district court
for further proceedings not inconsistent
with this opinion.

BACKGROUND

  Platinum Technology Incorporated (PTI)
sued Federal Insurance Company for
failure to defend PTI in a trademarking
infringement suit against Platinum
Software Corporation (PSC). PTI settled
with PSC and then sought to recover the
settlement amount from Federal. Count I
sought a declaration that Federal
breached its duty to defend and
indemnify. Count II sought money damages
for Federal's breach of the duty to
defend, and Count III sought money
damages for Federal's breach of the duty
to indemnify. Count IV sought additional
penalties because the breach was
"vexatious and unreasonable" under
Section 155 of the Illinois Insurance
Code.

  In a June 27, 2000 ruling, the district

court granted judgment on the pleadings in favor of PTI on Count I. Both parties then filed cross-motions for summary judgment on the remaining counts. Federal claimed that the settlement was neither in anticipation of litigation nor reasonable, thus the settlement was not covered by the policy. Rather, Federal contended, PTI paid the settlement to purchase the "Platinum" trademarks from PSC. The district court granted Federal's motion in part and denied it in part as to Counts II and III, finding that issues of material fact existed as to the valuation of the settlement amount. The district court held that PTI must establish the settlement was made in "anticipation of litigation" and that the amount of the settlement was "reasonable," including whether the claims settled were insurable. The district court also granted PTI's motion in part, finding that the settlement was made "in anticipation of litigation." Finally, the district court granted Federal's motion on Count IV, the section 155 claim, finding Federal's conduct was not vexatious or unreasonable.

A bench trial was held on the issues that remained. The district court found for PTI and judgment was entered on April 9, 2001, in the amount of $9,422,356.00 (which included prejudgment interest, attorney's fees, and the settlement amount of approximately $4 million in cash paid to PSC and the $6 million in Original Equipment Manufacturer (OEM) product credits available for future use, valued at $4.6 million in cash).

The issues in this case actually stem from earlier events involving PTI and PSC and the "Platinum" trademark. PSC registered the trademark in 1988, and prior to that used it in connection with its software business. It turned out that PTI was also using a similar, if not the exact same, trademark. After PSC became aware of this fact in 1989, it sought to have PTI stop using the trademark. PTI responded, stating that market confusion between the two companies was unlikely because they were in unrelated sectors of the software business. PTI sold mainframe computer software, while PSC sold software for personal computers. Despite this assertion, PTI began negotiating with PSC over the trademark usage and reached a settlement agreement in 1993.

The settlement agreement provided that neither company would use the "Platinum" trademark in areas of the market in which the other's goods and services competed. PTI later expanded its business into new markets, some of which may or may not have been reserved to PSC. According to PTI, changes in its own business, PSC's business, and the computer software market caused some product overlap between the two companies.

In 1996, PSC sought to change its image and corporate name, to "re-brand" itself. PSC approached PTI to see if PTI was interested in buying the "Platinum" trademark. PSC planned to use the sale to defray the costs of re-branding. PTI offered $100,000, and PSC countered with $1 million demand. PTI's offer went up another $150,000, but PSC held firm at $1 million and discussions broke down.

Then in July 1997, PSC sued PTI for, among other things, trademark infringement. PSC once again claimed that its "Platinum" trademark was being infringed upon by PTI, and that PTI's use of the "Platinum" mark was causing confusion in the marketplace. PSC sought compensatory damages, treble damages, and injunctive relief. PTI informed Federal of the suit and tendered its defense pursuant to the insurance policy. Federal refused to defend or indemnify PTI. As a result, PTI, without Federal, opened settlement negotiations with PSC. PSC's settlement demands were based on its own calculations of what it would cost to-re-brand the company, and were in excess of $20 million. PTI's offers were initially less than ten percent of that figure, and later roughly doubled, based on PTI's own estimate that re-branding would cost no more than $7 million. PTI and PSC eventually agreed on a $10 million package, including $4 million in cash and $6 million in OEM software credits, which would allow PSC to acquire PTI software at no cost and potentially resell it for a profit. Pursuant to the settlement agreement, PSC released and dismissed all of its claims against PTI and assigned all of its "Platinum" related trademarks to PTI.

After the settlement was entered into, a PTI employee recorded the "Platinum" trademark as a new "asset" with a value of $4 million and PTI began depreciating

this asset. After the settlement in 1999, PSC changed its name to Epicor Software Corporation. Epicor has not used any of the OEM credits and offered to take a one-time cash payment of between $2.5 and $3 million in lieu of the OEM credits.

ANALYSIS

A.  Standard of Review

The parties dispute the proper standard of review in this case. We review a district court's factual conclusions under the familiar clear error standard. See, e.g., Brunswick Leasing Corp. v. Wisconsin Central, Ltd., 136 F.3d 521, 526 (7th Cir. 1998). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). In contract interpretation cases, we review a district court's interpretation of an unambiguous contract de novo. Central States, Southeast and Southwest Areas Pension Fund v. Kroger Co., 226 F.3d 903, 910 (7th Cir. 2000), as corrected by, 241 F.3d 842 (7th Cir. 2001). If the contract is ambiguous, a more deferential standard of review is applied to the interpretation of the terms and factual findings. Id. In cases of mixed questions of law and fact the standard is oftentimes clear error (or abuse of discretion), though plenary review may be used when certain factors indicate it is warranted or needed. See Cook v. City of Chicago, 192 F.3d 693, 696-97 (7th Cir. 1999). This case turns on the factual issue of whether the settlement was a purchase of trademark assets or a release of legal liability, therefore we review for clear error. Even though this is a deferential review, it is by no means a rubber stamp.

B.  Reasonableness of the Settlement Amount

The district court granted PTI's motion for judgment on the pleadings finding Federal breached its duty to defend, and under Illinois law Federal is thereby estopped from relying on certain "policy defenses." Ins. Co. of the State of Pa. v. Protective Ins. Co., 592 N.E.2d 117,

121 (Ill. App. 1st Dist. 1992). Several of Federal's arguments, including the "known loss doctrine" barring plaintiff's recovery, are also defenses to the breach of the duty to defend. As Federal did not preserve these issues for review, we need not address them. See Outboard Marine Corp. v. Liberty Mut. Ins. Co., 607 N.E.2d 1204, 1209-11 (Ill. 1992) (outlining the "known loss doctrine").

Federal argues that the settlement amount was not reasonable because PTI purchased the "Platinum" trademark, an asset, thus the settlement was more than merely a release of legal liability. PTI's counters, stating that Federal's argument constitutes a "policy defense" and is barred. Though policy defenses are barred at this stage, other considerations and defenses arise where a settlement is involved because there is "the additional concern that the settlement was entered into in order to obtain insurance coverage for an otherwise uninsurable claim." United States Gypsum Co. v. Admiral Ins. Co., 643 N.E.2d 1226, 1241-46 (Ill. App. 1st Dist. 1994). In order to alleviate this concern, the insured is required to show that, among other things, the "amount of the settlement was reasonable." Id. at 1249-51; Caterpillar, Inc. v. Great Am. Ins. Co., 62 F.3d 955, 966-67 (7th Cir. 1995); Illinois Tool Works Inc. v. The Home Indem. Co., 24 F. Supp. 2d 851, 854 (N.D. Ill. 1998); West Am. Mortgage Co. v. Tri-County Reports, Inc., 670 F. Supp. 819, 821 (N.D. Ill. 1987); see also Fid. & Cas. Co. of New York v. Mobay Chem. Corp., 625 N.E.2d 151, 159 (Ill. App. 1st Dist. 1992); St. Michael's Orthodox Catholic Church v. Preferred Risk Mut. Ins. Co., 496 N.E.2d 1176, 1178-79 (Ill. App. 1st Dist. 1986). For instance, a defendant may raise the defense that the policy was not in effect when the injury occurred or that the policy does not cover the type of damages sustained, as when compensatory but not punitive damages are covered. See generally United States Gypsum, 643 N.E.2d at 1230-52. Federal may raise the argument that a portion or all of the settlement was for the purchase of PSC's trademark assets, and not to release PTI from liability for trademark infringement. Cf. Zurich Ins. Co. v. Killer Music, Inc., 998 F.2d 674, 679-80 (9th Cir. 1992) ("When the issue of the amount of a reasonable settlement

in good faith is addressed on remand, Zurich will have the opportunity to demonstrate that some portion, if not all, of the settlement amount is allocable to the value of the songs which Killer received in the settlement agreement.").

1. the cash payment

The facts show that prior to instituting the trademark infringement suit against PTI, PSC attempted to sell its trademark to PTI with a price based on the cost of re-branding the company. Only after a sale price could not be agreed upon did PSC sue PTI for infringement. PSC's subsequent settlement demands were based on the re-branding costs. PTI's settlement offer, in turn, was similarly based on its calculations of PSC's re-branding costs. The settlement agreement, in addition to a release of liability, provided for the assignment of the "Platinum" trademark to PTI. The "Settlement Agreement" was also called a "Trademark Assignment Agreement" by the parties. Then, after the settlement, PTI labeled the trademark an "asset" and began depreciating it.

Using a form of factual cognitive dissonance, PTI argues that the trademarks were of no value to it. However, the fact that PTI previously offered to pay PSC $250,000 for the trademark shows the trademark had some value to PTI. Moreover, PTI's no-value argument is wholly inconsistent with PTI's prior assertion that it was facing enormous liability for invading PSC's markets. PTI's stated objective was to expand its business into new markets, including markets reserved to PSC in the 1993 settlement. Part of the reason PTI agreed to the $10 million settlement was to relieve it from any future liability, thereby allowing PTI to pursue a market expansion that previously would have resulted in infringement.

The self-serving valuation of PTI's potential liability, in the hundreds of millions of dollars, by PTI's counsel was wholly speculative, as the district court recognized when ruling on the motions for summary judgment. Platinum Tech., Inc. v. Federal Ins. Co., 2001 WL 109814 at *5 (N.D. Ill. Feb. 2, 2001). And the initial

settlement offer amounts are of little evidentiary value considering the fact that they were based not on potential liability, but on re-branding costs.

According to the parties' own agreement, PSC's "Platinum" trademark was worth $4 million, and PTI purchased it in the settlement/assignment agreement. The $4 million cash payment to PSC was not made as part of a "reasonable settlement agreement" to relieve PTI of its liability to PSC for trademark infringement. United States Gypsum Co., 643 N.E.2d at 1249-51. Based on our review of the entire record, we conclude the district court clearly erred in finding that none of the settlement amount was for the purchase of trademarks.

## 2. the OEM credits

Generally, the purpose of a damage award "is to place the nonbreaching party in the position he would have been in had the contract been performed, but not to place him in a better position or provide him with a windfall recovery." Kohlmeier v. Shelter Ins. Co., 525 N.E.2d 94, 102-03 (Ill. App. 5th Dist. 1988). The amount of damages in insurance policy cases is sometimes determined by the contract pro visions, such as a liquidated damages clause, or by proof of actual damages. See United States Fid. and Guar. Co. v. Klein Corp., 558 N.E.2d 1047, 1052 (Ill. App. 1st Dist. 1990); Kohlmeier, 525 N.E.2d at 102. However, damages cannot be based on potential or future loss, unless it is reasonably certain to occur, nor can damages be based on speculation and conjecture. See Schoeneweis v. Herrin, 443 N.E.2d 36, 42 (Ill. App. 5th Dist. 1982); Harp v. Illinois Cent. Gulf R.R. Co., 370 N.E.2d 826, 829 (Ill. App. 5th Dist. 1977). Federal cannot escape its obligation to repay PTI for its loss if the damages award is based on a past or current loss and the amount is ascertainable. Cf. UNR Indus., Inc. v. Cont. Cas. Co., 942 F.2d 1101, 1103-06 (7th Cir. 1991).

The settlement in this case made liability and the OEM credit figure clear; however, the cash valuation of the OEM credit was based on speculation. The facts show that the OEM credits do not

have an actual value of $6 million, or even $4.6 million (the cash value the district court appears to have assigned to the credits). PSC/Epicor had already offered to take far less than $4.6 million in the form of an one-time cash payment of between $2.5 and $3 million, and, to date, PSC/Epicor has not used any of the OEM credits. In light of this objective valuation by PSC/Epicor, and additional points advanced by Federal, the calculation by PTI's expert clearly had no proper basis and was speculative. See Schoeneweis, 443 N.E.2d at 42 (holding that "the party seeking to recover" need "not only to establish that he sustained damages but also to establish a reasonable basis for computation of those damages"). Given that the exact value of the OEM credits is speculative, requiring Federal to reimburse PTI in the amount of $6 million or $4.6 million for an expense PTI may never incur would allow PTI to reap a significant windfall. See Kohlmeier, 525 N.E.2d at 102-03. Therefore, we vacate the district court's valuation and remand this issue for reconsideration to determine the current monetary value of the OEM credits.

The evidence relied on by the district court to value the OEM credits was clearly not credible in light of the objective valuation of the credits by PSC/Epicor. Thus, in considering this issue, the district court should not only look to expert valuations, but also seek to determine if there are additional objective indicators of the value of the OEM credits beyond those mentioned in this opinion.

C.  Prejudgment Interest

Federal argues that prejudgment interest only accrued from the time the district court entered judgment against Federal because the amount of damages was, until then, undetermined. In the alternative, Federal argues that prejudgment interest should have been awarded at the statutory rate and not the equitable rate. The issue of prejudgment interest has been largely rendered moot by our decision today. Because PTI is not entitled to part of the original damages award, it is logically not entitled to prejudgment interest for that portion. Prejudgment interest for the OEM credits is another

matter.

In Illinois, prejudgment interest, whether grounded in a statute or equity, is based on the concept of fairness and is awarded to make the plaintiff whole for the loss of use of money wrongfully withheld. In re Estate of Wernick, 535 N.E.2d 876, 888 (Ill. 1989). "Generally, prejudgment interest 'is not recoverable absent a statute or agreement providing for it.'" New Hampshire Ins. Co. v. Hanover Ins. Co., 696 N.E.2d 22, 26 (Ill. App. 1st Dist. 1998) (quoting City of Springfield v. Allphin, 413 N.E.2d 394, 395 (Ill. 1980)). The Illinois Interest Act, 815 ILCS sec. 205/2 (West 2001), provides a statutory rate of 5%, or when circumstances allow, a court may award interest at an equitable rate (using the Act as a benchmark). 815 ILCS sec. 205/2 ("Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing . . ."). And under Illinois law, insurance polices are written instruments. See, e.g., J.R. Couch v. State Farm Ins. Co., 666 N.E.2d 24, 27-28 (Ill. App. 3d Dist. 1996).

In an action in equity, prejudgment interest may be awarded at a rate determined by the court. Wernick, 535 N.E.2d at 888-89. An Illinois appellate court has thus concluded that for actions at law, including breach of contract, prejudgment interest cannot be awarded at an equitable rate. Cont'l Cas. Co. v. Commonwealth Edison Co., 676 N.E.2d 328, 331-34 (Ill. App. 1st Dist. 1997). On the other hand, some of the broad language in Wernick indicates that the statutory rate is merely a benchmark used "to establish a rate sufficient to compensate" because the statute has not kept pace with the times. Wernick, 535 N.E.2d at 888-89 ("We conclude that the interest statute is a remedy separate from the equitable powers of the court to make an injured party whole."); see also Cummings v. Beaton & Associates, Inc., 618 N.E.2d 292, 310-12 (Ill. App. 1st Dist. 1992) ("Wernick does open the way for courts to apply the prime rate as a means of better compensating injured parties . . ."). Continental rejected this broad reading of Wernick, reasoning the plaintiff's theory that "every circuit court judge has equitable powers" merely described

the judge's power based on the "relief available to a plaintiff [ ] derived from the substance of the claim before it." Cont'l Cas. Co., 676 N.E.2d at 331-34 (citations omitted). PTI cites Wernick as support for the equitable award in this case, though PTI does not argue that this was an action in equity.

Federal argues that absent a finding of bad conduct, prejudgment interest can only be awarded at the statutory rate. The broader rule that equitable interest awards are unavailable absent bad, vexatious, or unreasonable conduct is dispositive, and we need not reach the issue of whether the increased equitable interest award was proper under the circumstances. There is extensive support for this proposition in Wernick, Continental Casualty, and Cummings. Wernick, 535 N.E.2d at 888-89 ("The equitable award of interest is based on the circumstances surrounding Macks' breach of fiduciary duty . . ."); Cont'l Cas. Co., 676 N.E.2d at 331-34 ("We also observed that the element of bad conduct necessary for either a statutory or equitable award of interest was not present."); Cummings, 618 N.E.2d at 310-12 (commenting, while affirming the award of prejudgment interest at the statutory rate that: "[u]nlike the situation in Wernick, McDonald's is not in a fiduciary relationship with the Cummingses and the award of prejudgment interest . . . was based on the provision that permits interest to accrue on written instruments after the money is due."). Absent some type of bad, vexatious, or unreasonable conduct prejudgment interest should be awarded at the statutory rate of 5% on written instruments. cf. Krantz v. Chessick, 668 N.E.2d 77, 80-81 (Ill. App. 1st Dist. 1996).

In addressing the section 155 claim, the district court specifically found that Federal did not engage in vexatious conduct. Instead, the court found that Federal was involved in "an honest dispute as to whether it had a legal duty to defend PTI in its lawsuit with PSC." Platinum Tech., Inc., 2001 WL 109814 at *10. Nothing that happened during trial or after indicates that Federal later engaged in any bad conduct to warrant imposition of a rate higher than the statutory rate. The district court twice characterized Federal's conduct as merely

"wrongful" in its oral ruling of judgment and in its denial of Federal's post trial motions. Rather, the district court made the equitable determination that a higher interest rate was required to make PTI whole. However, as we noted, the interest rate provided for under Illinois law for instruments of writing is 5%, and because the district court did not find any bad or vexatious conduct, we need not consider whether the increase based on equitable considerations was warranted. We conclude that the district court abused its discretion in awarding prejudgment interest at an equitable rate and vacate that award.

Prejudgment interest may be recovered on written instruments, including insurance policies, calculated from the time the money was due under the policy. 815 ILCS sec. 205/2; J.R. Couch, 666 N.E.2d at 27-28. And even though the exact monetary value of the OEM credits remains undetermined, prejudgment interest can be awarded for that portion of the damages award. Once the settlement was entered into, the amount of the OEM credits was known to Federal ($6 million). Though the exact cash value of the credits was not certain, it was by no means unprovable. Cummings, 618 N.E.2d at 310-11. More importantly, the amount due is susceptible to judicial determination, therefore prejudgment interest can be awarded. See New Hampshire Ins. Co., 696 N.E.2d at 27-28; J.R. Couch, 696 N.E.2d 22, 27-28; Bank of Chicago v. Park Nat'l Bank, 640 N.E.2d 1288, 1296 (Ill. App. 1st Dist. 1994); Martin v. Orvis Brothers & Co., 323 N.E.2d 73, 82-85 (Ill. App. 1st Dist. 1974); L.W. Foster Sportswear Co. v. Goldblatt Bros., Inc., 356 F.2d 906, 910-11 (7th Cir. 1966).

CONCLUSION

We Reverse the judgment of the district court because the $4 million cash payment by PTI to PSC was for the purchase of a trademark asset and not part of a reasonable settlement of PSC's claims against PTI, and Remand with directions to the district court to determine the current monetary value of the OEM credits and recalculate the prejudgment interest at the statutory rate once the precise value of the credits is ascertained. Rule 36 to apply on the remand.