In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 18-3434

ANTRIM PHARMACEUTICALS LLC,

*Plaintiff-Appellant,*

*v.*

BIO-PHARM, INC.,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 16-cv-00784 — **Matthew F. Kennelly**, *Judge.*

---

ARGUED SEPTEMBER 16, 2019 — DECIDED FEBRUARY 14, 2020

---

Before BAUER, BRENNAN, and ST. EVE, *Circuit Judges.*

BRENNAN, *Circuit Judge.* Antrim Pharmaceuticals LLC and
Bio-Pharm, Inc. arranged to manufacture and sell a generic
anti-depressant. When their plan fell apart, litigation fol-
lowed. Antrim sued Bio-Pharm for breach of contract, and
Bio-Pharm counterclaimed based on promissory estoppel or,
in the alternative, breach of contract. Following a five-day
trial, a jury found for Bio-Pharm on Antrim's breach of

contract claim and for Antrim on Bio-Pharm's counterclaim. Neither party was awarded damages. Antrim appealed.

Antrim challenges the district court's jury instructions, evidentiary rulings, and decision to allow Bio-Pharm to request lost profits as a remedy on its counterclaim. Bio-Pharm argues Antrim waived these arguments on appeal because Antrim agreed to a general verdict form and did not file a post-trial motion under Federal Rule of Civil Procedure 50(b). We conclude that Bio-Pharm's waiver argument has no merit but affirm because the district court committed no reversible error.

## I.

As 2011 gave way to the new year, some in the pharmaceutical industry believed easy money was to be made. The patent for Lexapro, an anti-depressant with billions of dollars in yearly sales, was set to expire in March 2012. *See* Gary Robbins, *Consumers to Save Big as Lexapro Patent Expires*, SAN DIEGO UNION-TRIBUNE, Mar. 5, 2012, https://www.sandiegouniontribune.com/business/biotech/sdut-consumes-save-big-lexapro-patent-expires-2012mar05-htmlstory.html. The expiration of Lexapro's patent presented a potentially lucrative business opportunity for pharmaceutical companies looking to sell the generic version of Lexapro, known as escitalopram.

Enter the startup company Antrim and the drug manufacturer Bio-Pharm. These companies appeared to be a perfect match to profit from Lexapro's loss of patent protection. Brian Tambi, the head of Antrim, had extensive experience in growing pharmaceutical companies from the ground up. Bio-Pharm was a well-known contract manufacturer for the generic drug industry. And Antrim and Bio-Pharm had

already established a business relationship—BrianT Laboratories (Antrim's corporate predecessor), Bio-Pharm, and a third company had signed a non-binding term sheet in December 2009 to develop, manufacture, market, and sell unspecified pharmaceutical products. The parties to the term sheet planned to share equity in that joint pharmaceutical arrangement. But the business deal never materialized, and the term sheet lapsed in early 2010. Although Antrim and Bio-Pharm originally intended to sign an updated version of the term sheet for their escitalopram venture, the two companies never signed a written contract to replace the term sheet after its expiration.

The two companies forged ahead without a signed agreement. In May 2015, the Food and Drug Administration approved Antrim's Abbreviated New Drug Application ("ANDA") for escitalopram, which permitted Antrim to sell escitalopram and contract out its manufacturing to Bio-Pharm. Later that year, Bio-Pharm manufactured the first batch.

Bio-Pharm, however, never shipped the escitalopram to Antrim. Bio-Pharm insists it was not obligated to supply Antrim with the escitalopram because the companies never signed a new agreement after the term sheet expired. Although the companies lacked a written contract, Bio-Pharm claims Antrim had promised they would share equity in the new venture according to the now-expired term sheet. But when Antrim told Bio-Pharm that equity was off the table, Bio-Pharm contends it decided to leave the business venture.

Antrim tells a different story. According to Antrim, the two parties committed to an oral contract in early 2012, under which Bio-Pharm received a share of net profits instead of

equity, but Bio-Pharm backed out of that agreement when Antrim refused to renegotiate the terms of the deal.

Antrim sued Bio-Pharm for allegedly breaching the oral contract. Bio-Pharm counterclaimed on the theory of promissory estoppel, asserting it relied on Antrim's false promises of shared equity in the venture. In the alternative, Bio-Pharm counterclaimed against Antrim for breaching the oral contract Antrim claimed existed.

Both parties filed motions in limine relevant to this appeal. Antrim argued the district court should preclude expert testimony by one of Bio-Pharm's expert witnesses, Mark Schwartz, on how the FDA regulates ANDA holders. Bio-Pharm argued the district court should preclude expert testimony by Sean Brynjelsen, one of Antrim's expert witnesses, on industry practices and to what degree Bio-Pharm's alleged breach impaired the value of Antrim's business under a lost enterprise value theory. The district court denied Antrim's motion in limine to exclude Schwartz's testimony on FDA practices, but it granted Bio-Pharm's motions in limine to exclude those portions of Brynjelsen's testimony on industry practices and Antrim's losses under a lost enterprise value theory.

Several other motions are pertinent to this appeal. In the final pretrial order and later at the jury instruction conference, Antrim proposed Jury Instruction No. 8. That instruction stated that under FDA policy the holder of an ANDA is also the owner of the product underlying that ANDA. The district court rejected Jury Instruction No. 8 after finding the instruction on "what an ANDA means" was irrelevant to the case. DE 169 at 39. Antrim also filed a motion to bar Bio-Pharm from requesting lost profits as a remedy for its counterclaim

because Bio-Pharm missed the disclosure deadline imposed by Federal Rule of Civil Procedure 26(a)(1). The district court ruled that Bio-Pharm violated Rule 26(a)(1) but denied Antrim's motion on the grounds that the violation was harmless.

The case went to trial, and the district court used a general verdict form after neither party objected.[1] Following the jury's verdict in favor of Bio-Pharm on Antrim's claim and in favor of Antrim on Bio-Pharm's counterclaim, Antrim timely appealed.

## II.

On appeal, Antrim alleges the district court erred by: (1) rejecting Jury Instruction No. 8, (2) denying its motion to preclude Schwartz's testimony on FDA practices, (3) granting Bio-Pharm's motion to preclude Brynjelsen's testimony on industry practices, (4) granting Bio-Pharm's motion to preclude Brynjelsen's testimony on Antrim's lost enterprise value, and (5) allowing Bio-Pharm to request lost profits as a remedy for its counterclaim.[2]

---

[1] Among the types of jury verdicts that federal courts recognize are general and special. *See Turyna v. Martam Const. Co., Inc.*, 83 F.3d 178, 180–81 (7th Cir. 1996). "General verdicts simply ask the jury to answer the question 'who won,' and if the winning party is entitled to a monetary award, to answer the question 'how much.'" *Id.* at 181. Special verdict forms require the jury to make written findings on issues of fact; the court then applies the law to the jury's findings. *See* FED. R. CIV. P. 49(a).

[2] This court has cautioned appellate counsel to focus on "one central issue if possible, or at most on a few key issues." *United States v. Boscarino*, 437 F.3d 634, 635 (7th Cir. 2006) (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)). By arguing so many issues (and sub-issues) on appeal, Antrim has "consume[d] space that [could have] be[en] devoted to developing []

Before addressing the substance of Antrim's arguments, we consider whether Antrim has waived any of its arguments on appeal. Bio-Pharm asserts "every issue appealed by Antrim" is rendered "moot" because the district court used a general verdict form and Antrim did not file a motion for a renewed judgment as a matter of law under Rule 50(b). We disagree.

Bio-Pharm incorrectly assumes that on appeal Antrim challenges the sufficiency of the evidence. For example, Bio-Pharm contends that "[a] general verdict, without more, will … give rise to the presumption that material fact issues have been resolved in favor of the prevailing party." *Freeman v. Chicago Park Dist.*, 189 F.3d 613, 616 (7th Cir. 1999) (quoting *Dual Mfg. & Eng'g, Inc. v. Burris Indus., Inc.*, 619 F.2d 660, 667 (7th Cir. 1980)). Although a true statement of the law, it is irrelevant to this appeal because Antrim challenges pretrial rulings, not the jury's factual findings. Therefore, Antrim has not waived any of the issues it raises on appeal by failing to file for a renewed judgment as a matter of law. Bio-Pharm is also correct that "[a] party's failure to comply with Rule 50(b) forecloses any challenge to the sufficiency of the evidence on appeal." *Consumer Products Research & Design, Inc. v. Jensen*, 572 F.3d 436, 437–38 (7th Cir. 2009) (citing *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404–07 (2006)). But again, Antrim does not challenge the sufficiency of the evidence on appeal. Here too, Antrim has not waived any arguments.

---

arguments with some promise." *Howard v. Gramley*, 225 F.3d 784, 791 (7th Cir. 2000).

Turning to the merits, we group Antrim's arguments into challenges related to the jury instructions, to the motion in limine rulings, and to Bio-Pharm's counterclaim.

### A. Jury Instructions

"We review the legal accuracy of [] jury instruction[s] de novo, but we evaluate the particular phrasing for abuse of discretion." *United States v. Beavers*, 756 F.3d 1044, 1056 (7th Cir. 2014) (citing *United States v. Dickerson*, 705 F.3d 683, 688 (7th Cir. 2013)). If a court's instructions were legally accurate, "[r]eversal is warranted 'only if it appears both that the jury was misled and that the instructions prejudiced the defendant.'" *United States v. McKnight*, 655 F.3d 786, 791 (7th Cir. 2011) (quoting *United States v. Curry*, 538 F.3d 718, 731 (7th Cir. 2008)); *see also Jimenez v. City of City of Chicago*, 732 F.3d 710, 717 (7th Cir. 2013) (citing *Gile v. United Airlines, Inc.*, 213 F.3d 365 374–75 (7th Cir. 2000)) ("If the instructions were deficient, we ask whether the jury was confused or misled by the instructions. Even if we believe that the jury was confused or misled, we would need to find that the defendants were prejudiced before ordering a new trial.").

According to Antrim, the district court erred by failing to instruct the jury on the legal significance of Antrim holding an escitalopram ANDA. Before trial, Antrim proposed Jury Instruction No. 8, which directed the jury to "conclude that Antrim owns [e]scitalopram according to FDA regulation and policy" if it found "that Antrim is the holder of the ANDA for [e]scitalopram." DE 173-3 at 13. Since the district court rejected Jury Instruction No. 8 and never instructed the jury on the preclusive effects of ANDA ownership, Antrim claims "the trial devolved into a debate about [whether] Bio-Pharm[] … owned an interest in the ANDA, or was promised an

ownership interest in the ANDA." Antrim contends this failure to instruct the jury on the consequences of ANDA ownership "was extremely confusing for the jury." Because Antrim does not dispute the legal accuracy of the district court's jury instructions—but rather contends its instructions were insufficient—Antrim must show the instructions "confused or misled the jury" and caused it prejudice for this court to reverse. *Jimenez*, 732 F.3d at 717 (7th Cir. 2013). Antrim fails to meet this strict standard.

Neither party disputes that Antrim owned an escitalopram ANDA and was an ANDA holder for escitalopram under FDA regulations. But the parties dispute the consequences of that ownership. Antrim argues ANDA holders own the products manufactured in accordance with those ANDAs as well as the ANDAs themselves. Antrim insists that because it owns an ANDA for escitalopram and Bio-Pharm was aware of that ownership, Bio-Pharm accepted its role as a contractor and not a co-owner. Bio-Pharm's position is that although Antrim held an ANDA for escitalopram, Antrim did not own the escitalopram manufactured by Bio-Pharm under the ANDA unless Bio-Pharm agreed to sell it. We conclude FDA regulations support Bio-Pharm's position.

Before manufacturing and marketing a generic drug, a company must file an ANDA with the FDA. *See* FDA, *Abbreviated New Drug Application (ANDA)*, https://www.fda.gov/drugs/types-applications/abbreviated-new-drug-application-anda (May 22, 2019). To receive FDA approval, ANDA applicants are not required to replicate original costly clinical trials, but they must demonstrate their generic drug functions in the same manner as the non-generic version of the drug. *Id.* After the FDA accepts an ANDA filed by an ANDA applicant, that

applicant "owns [the] approved ANDA" and becomes the "ANDA holder." 21 C.F.R. § 314.3(b). Being an ANDA holder does not confer any exclusive rights. For example, when this case was tried, at least six companies held ANDAs for escitalopram. Essentially, an ANDA serves as an FDA-granted license to manufacture and market the generic version of a drug. But ownership of an ANDA, and the ability to manufacture and market the drug listed in that ANDA, does not decide ownership of any product manufactured in accordance with that ANDA.[3] Indeed, the relevant regulations never equate ownership of the ANDA with ownership of the underlying product.

Before the district court, the parties disputed ownership of the escitalopram, not ownership of the ANDA. As described above, these are unrelated concepts; whether Antrim had an ownership interest in the ANDA was irrelevant to the question of ownership. Reversal is not appropriate because Antrim has failed to show the district court "confused or misled the jury" by not permitting Jury Instruction No. 8. *See Jimenez*, 732 F.3d at 717. In fact, Jury Instruction No. 8 likely posed a risk of confusing or misleading even the most astute jurors given its irrelevant language on ANDA ownership.

---

[3] A hypothetical can demonstrate the difference in this context between a license and ownership. Suppose a landowner sells a license to a business that allows the business to harvest timber on Blackacre. Under that license, the business can keep the lumber it harvests. And suppose the business hires a third party to remove the timber located on Blackacre. If the business grants the third party an interest in the harvested timber in exchange for the third party's work, the third party then possesses an ownership interest in the timber without having an ownership interest in the license itself.

Because ANDA ownership was immaterial to this case and Antrim has not shown the district court's instructions confused or misled the jury, the district court did not err by rejecting Jury Instruction No. 8.

## B. Motions in Limine

Antrim next challenges the district court's rulings on three motions in limine. We review rulings on motions in limine for abuse of discretion. *See Carmody v. Bd. of Trustees. of the Univ. of Ill.*, 893 F.3d 397, 407 (7th Cir. 2018) (citing *Empire Bucket, Inc. v. Contractors Cargo Co.*, 739 F.3d 1068, 1071 (7th Cir. 2014)); *United States v. Johnson*, 916 F.3d 579, 586–87 (7th Cir. 2019) (quoting *United States v. Causey*, 748 F.3d 310, 316 (7th Cir. 2014)) ("We afford the district court's evidentiary rulings special deference and find an abuse of discretion 'only where no reasonable person could take the view adopted by the trial court.'").

### 1. *Schwartz's testimony on FDA practices*

Mark Schwartz was an expert witness for Bio-Pharm and a former FDA lawyer. Schwartz had extensive experience with federal drug regulations: he spent 13 years at the FDA before joining a private firm that advises generic drug manufacturers. In his expert witness report, Schwartz disclosed he intended to testify about what the FDA would infer based on Antrim's status as an ANDA holder for escitalopram. Specifically, Schwartz planned to testify that the FDA would treat the relationship between Antrim and Bio-Pharm as "a contractual relationship for Bio-Pharm to manufacture the drug at issue on behalf of Antrim" because Bio-Pharm was identified as the manufacturer on the ANDA application. DE 154 Ex. 1 at 2. Schwartz also planned to testify that the "FDA

would not infer any ownership relationship one way or the other" from the ANDA. *Id.* Antrim filed a motion in limine to preclude Schwartz's testimony on the basis that: (1) his testimony was inaccurate because "applicable federal statutes and FDA regulations all make clear that the ANDA 'holder' is the 'owner' of the product" and (2) allowing an FDA officer to testify on a legal issue invades the province of the court. DE 132 at 1. The district court found these arguments unpersuasive, and Schwartz testified on ANDA ownership at trial. On appeal, Antrim raises the same arguments it raised before the district court.

Antrim's first argument is easily rejected. Schwartz's testimony that ownership of an ANDA does not determine ownership of the underlying product is legally correct. Just as the district court did not err by rejecting Jury Instruction No. 8, the district court did not err by rejecting Antrim's motion in limine to preclude Schwartz's testimony.

Antrim's second argument—that the district court should not have permitted Schwartz to testify on FDA statutes and regulations—is more complicated. Experts generally may not testify on pure issues of law, such as the meaning of statutes or regulations. *See, e.g.*, *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) (citing *Bammerlin v. Navistar Int'l Transportation Corp.*, 30 F.3d 898, 900 (7th Cir. 1994)) ("The … meaning of the statute and regulations [is] a subject for the court, not for testimonial experts."). But courts have permitted regulatory experts to testify on complex statutory or regulatory frameworks when that testimony assists the jury in understanding a party's actions within that broader framework. *See, e.g.*, *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 478–79 (S.D.N.Y. 2016) ("Dr. Parisian's experience as an

officer at the FDA qualifies her to opine on the background of the FDA, its functions, and the FDA's regulatory framework. … Dr. Parisian's testimony regarding compliance with FDA regulations does not usurp the role of the jury, but rather merely helps them understand a complicated statutory framework."); *Jones v. Novartis Pharms. Corp.*, 235 F. Supp. 3d 1244, 1255–56 (N.D. Ala. 2017) ("The court finds that Dr. Parisian is qualified, based on her experience at the FDA as a Medical Officer, to offer testimony about regulatory requirements for the testing, marketing, and development of prescription drugs."); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Practices & Prods. Liab. Litig.*, No. 3:09-md-02100-DRH-PMF, 2011 WL 6302287 at *16 (N.D. Ill. Dec. 16, 2011) (stating the same). *See also* FED. R. EVID. 702(a) ("A witness who is qualified as an expert … may testify in the form of an opinion or otherwise if: the expert's … specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.").

The district court properly admitted Schwartz's testimony on the FDA's statutory and regulatory authority. His testimony helped the jury better grasp the relationship between Antrim and Bio-Pharm in light of the FDA's regulations on generic pharmaceuticals. Schwartz's testimony on ANDA ownership assisted the jury with understanding how Antrim's ownership of the escitalopram ANDA was irrelevant to whether Antrim owned the escitalopram manufactured by Bio-Pharm. And that testimony was particularly important in this case, where one of Antrim's witnesses incorrectly stated there is "no difference" between ownership of an ANDA and ownership of the underlying product. DE 213 at 406. We conclude the district court did not abuse its discretion by denying

Antrim's motion in limine to prevent Schwartz from testifying on FDA practices.

### 2. *Brynjelsen's intended testimony on industry practices*

Antrim then challenges the preclusion of testimony from its expert, Sean Brynjelsen, on industry practices. With over 20 years of experience working for pharmaceutical companies, Brynjelsen intended to testify that, according to his experience and "well-known industry practice and norms," contract manufacturers like Bio-Pharm "never [hold] an ownership interest in the drugs falling under the ANDA." DE 140 at 12. But after Bio-Pharm filed a motion in limine to preclude Brynjelsen's testimony on industry practices, the district court prohibited Brynjelsen from testifying that "Antrim's ownership of the ANDA for escitalopram somehow makes it less likely or impossible that Antrim promised Bio-Pharm an equity share." DE 168 at 4.

On appeal, Antrim argues the district court erred by granting Bio-Pharm's motion in limine because Brynjelsen's testimony would have established that Antrim's ownership of the escitalopram ANDA meant Antrim was more likely to own escitalopram manufactured under that ANDA. But the district court's decision to preclude Brynjelsen's testimony on this issue does not rise to an abuse of discretion. During his deposition, Brynjelsen admitted he did "not have specific knowledge" of whether Antrim and Bio-Pharm ever agreed to split equity in the escitalopram produced under the ANDA. DE 142 at 33. Without specific knowledge of any agreement between Antrim and Bio-Pharm, Brynjelsen's intended testimony on general industry customs and practices was not relevant to whether the parties entered into an

agreement to share equity in this case. So the district court did not err by precluding this line of testimony.

### 3. *Brynjelsen's intended testimony on Antrim's lost enterprise value*

Antrim also sought Brynjelsen's testimony on how Bio-Pharm's alleged breach reduced Antrim's profits and reduced the value of Antrim's business. But the district court excluded Brynjelsen's latter calculation after finding that Antrim had "failed to show a legal basis or a proper evidentiary foundation for recoverability of damages for lost enterprise value in this case (as distinguished from lost profits)." DE 174.

Antrim argues the district court erred because federal courts, applying Illinois law,[4] permit breach of contract awards based on theories of lost enterprise value. But Antrim oversimplifies Illinois law, under which "damages cannot be based on potential or future loss, unless it is reasonably certain to occur, nor can damages be based on speculation and conjecture." *Platinum Tech., Inc. v. Fed. Ins. Co.*, 282 F.3d 927, 933 (7th Cir. 2002) (citing *Schoeneweis v. Herrin*, 443 N.E.2d 36, 42 (1982); *Harp v. Ill. Cent. Gulf R.R. Co.*, 370 N.E.2d 826, 829 (1997)). *See also Westlake Fin. Grp. v. CDH-Delnor Health Sys.*, 25 N.E.3d 1166, 1179 (Ill. App. Ct. 2015) (quoting *Thornhill v. Midwest Physician Ctr. of Orland Park* 787 N.E.2d (Ill. App. Ct.

---

[4] Neither party on appeal raises a conflict of law issue, and this suit, arising out of diversity jurisdiction, was filed in the U.S. District Court for the Northern District of Illinois. We therefore apply Illinois law. *See Wood v. Mid-Valley Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) ("The operative rule is that when neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits.").

2003)) ("Damages are speculative when uncertainty exists as to the facts of their existence.").

Brynjelsen failed to show the damages to Antrim's business value were reasonably certain to occur; he instead based his estimate on impermissible conjecture and speculation. To reach his estimate, he took the annual profits he believed Antrim would have received had Bio-Pharm provided the escitalopram and multiplied that figure by between 8.3 and 24 times to account for "precedent transactions" involving other acquired companies. DE 140 at 8. But, as Brynjelsen admitted in his deposition, he never compared those acquired companies to Antrim. In addition to this exercise in conjecture, another problem arises: these damages would never occur unless Antrim chose to sell itself. And Antrim has provided no evidence that its owners ever intended to sell the business or had ever engaged in discussions with potential buyers. Thus, Brynjelsen's lost value calculations assumed Bio-Pharm and Antrim would successfully introduce escitalopram into the market, the venture would prove profitable, Antrim's market value would rise to between 8.3 and 24 times its annual profits, and Antrim would sell itself to an interested buyer. This chain of assumptions grows weaker with each additional link. Brynjelsen's potential testimony, replete with assumptions, was based on improper speculation and conjecture. Furthermore, because Antrim provided no evidence that it intended to sell itself, Brynjelsen failed to show the loss of Antrim's business value was "reasonably certain" to have occurred. *Platinum Tech., Inc.*, 282 F.3d at 933 (7th Cir. 2002) (citations omitted). Applying Illinois law, the district court therefore did not abuse its discretion by barring Antrim from presenting to the jury Brynjelsen's calculations on Antrim's lost enterprise value.

**C. Bio-Pharm's Counterclaim**

Lastly, Antrim argues the district court erred by allowing Bio-Pharm to request lost profits as an alternative remedy for its counterclaim. Roughly three months before the trial began—and more than two years after its initial Rule 26(a)(1) disclosures—Bio-Pharm revealed for the first time it intended to request lost profits based on Brynjelsen's testimony on Antrim's lost profits.[5] Specifically, Bio-Pharm argued that if the parties had a contract, Bio-Pharm was entitled to 25% of any of Antrim's profits under that contract. Antrim moved to prevent Bio-Pharm from relying on Brynjelsen's lost profits testimony due to Bio-Pharm's last minute disclosures. The district court looked to whether Bio-Pharm violated Rule 26(a)(1)'s disclosure rules and, if such a failure to timely disclose did occur, whether Bio-Pharm could still rely on Brynjelsen's testimony by showing the late disclosure was "justified or [] harmless" under Rule 37(c)(1). The district court decided Bio-Pharm had violated Rule 26(a)(1) but also deemed Bio-Pharm's late disclosure harmless because Antrim was aware of Bio-Pharm's counterclaim "from a very early point in this case." DE 189. The district court also found Antrim knew that Bio-Pharm intended to ask the jury for 25% of the profits derived from Antrim's escitalopram sales and that Antrim failed to identify anything it would have done

---

[5] Although Brynjelsen's calculations of Antrim's lost enterprise value rely on his calculations of Antrim's lost profits, we do not find it necessary to decide whether Brynjelsen's lost profits calculations are too speculative under Illinois law.

differently if Bio-Pharm had complied with Rule 26(a)(1). So the district court denied Antrim's motion to exclude.

Here, Antrim argues the district court erred by allowing Bio-Pharm's counterclaim to advance to trial because Bio-Pharm missed the Rule 26(a)(1) disclosure deadline and because Brynjelsen never established that his lost profit calculations could be used to measure Bio-Pharm's damages. Even if these arguments had merit, "[i]t is well established that a party cannot appeal an issue it won at trial." *See Estate of Kanter v. Comm'r*, 432 F. App'x 618, 619–20 (7th Cir. 2011) (citing *Electrical Fittings Corp. v. Thomas & Betts Co.*, 307 U.S. 241, 242 (1939)). And Antrim prevailed against Bio-Pharm's counterclaim at trial—barring Antrim's appeal of the district court's Rule 37(c)(1) determination. Nevertheless, Antrim asserts the jury in this case was improperly permitted to "off-set" Antrim's breach of contract claim with Bio-Pharm's counterclaim. But Antrim provides no authority for this assertion. Essentially, Antrim invites this court to ignore precedent and speculate as to why the jury issued a split verdict. We decline to do so.

### III.

The district court correctly ruled on the various evidentiary and procedural questions presented in this case, so we AFFIRM its judgment.